Case No. 12-14898-B

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE LITIGATION

_____

On Appeal from the United States District Court
for the Southern District of Florida
No. 08-md-01916
(Nos. 07-60821, 08-80421, 08-80465, 08-80480, 08-80508,
10-60573, 10-80652, 11-80404, 11-80405)
(The Honorable Kenneth A. Marra)
_____

# RESPONSE AND REPLY BRIEF OF APPELLANTS
# CHIQUITA BRANDS INTERNATIONAL, INC. AND
# CHIQUITA FRESH NORTH AMERICA LLC
_____

Jonathan M. Sperling             John E. Hall
COVINGTON & BURLING LLP          James M. Garland
The New York Times Building      Mark W. Mosier
620 Eighth Avenue                COVINGTON & BURLING LLP
New York, NY 10018               1201 Pennsylvania Avenue, N.W.
Telephone: (212) 841-1000        Washington, D.C. 20004
Fax: (212) 841-1010              Telephone: (202) 662-6000
                                 Fax: (202) 662-6291

*Counsel for Chiquita Brands Int'l., Inc. and Chiquita Fresh North America LLC*

## AMENDED CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Appellants, Chiquita Brands International, Inc. and Chiquita Fresh North America LLC, certifies that no publicly held corporation owns 10% or more of either party's stock.  Chiquita Fresh North America LLC is a wholly-owned indirect subsidiary of Chiquita Brands International, Inc.  Chiquita Brands International, Inc. has no parent corporation.

Counsel also certifies and adopts the lists of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations (noted with its stock symbol if publicly listed) that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, and other identifiable legal entities related to a party, included in Appellants' Amended Certificate of Interested Persons filed on May 28, 2013, Appellees' Amended Certificate of Interested Persons filed on July 31, 2013, and Appellees' Certificate of Interested Persons filed by Attorney Paul David Wolf on August 5, 2013.

1. Additional persons or entities to be added to the above mentioned Certificates of Interested Persons include the following:

Eichensehr, Kristen

i

2.  Persons or entities to be removed from the above mentioned Certificates of

    Interested Persons include the following:

Chiquita Food Innovation B.V. (Netherlands)

Chiquita International Services Group N.V. (Belgium)

Chiquita Shared Services (Belgium)

FMR LLC

# TABLE OF CONTENTS

AMENDED CERTIFICATE OF INTERESTED PERSONS &
CORPORATE DISCLOSURE STATEMENT.................................................. i

TABLE OF CONTENTS.............................................................................. iii

TABLE OF AUTHORITIES ......................................................................... vi

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ............................................................................................. 6

I.    Plaintiffs' ATS Claims Must Be Dismissed Under *Kiobel*. ......................... 6

    A.    Chiquita's Limited Domestic Conduct Is Insufficient To
Displace The Presumption Against Extraterritoriality......................... 7

    B.    Plaintiffs' Attempts To Create And Apply A New Presumption
Fail........................................................................................ 11

        1.    *Kiobel* Does Not Create A New Presumption. ...................... 11

        2.    The Presumption Is Not Displaced By The Factors On
Which Plaintiffs Rely........................................................ 13

II.   The District Court Lacked Discretion To Deny The Motion To
Dismiss For Each Plaintiff Who Failed To Plead A Cognizable Claim. ..... 16

III.  Plaintiffs Failed To Allege Sufficient Facts To Establish That The
Colombian Armed Groups Violated International Law. ........................... 20

    A.    No Plaintiff Has Adequately Pled The State Action Necessary
To Support Claims For Extrajudicial Killing Or Torture. .................. 20

        1.    Under This Court's Prior Decisions, A Plaintiff Must
Connect The Alleged State Action To The Act Of
Violence That Forms The Basis Of That Plaintiffs'
Claim. ........................................................................... 20

        2.    A Plaintiff Must Connect The Alleged State Action To
The Particular Act Of Violence Even Where A Mass
Atrocity Is Alleged........................................................... 24

3.      Plaintiffs' Claims Have Significant Foreign Policy
Implications................................................................... 25

4.      Plaintiffs Cannot Save Their Claims By Relying On
Alternative State-Action Theories. ........................... 26

B.      Plaintiffs' Failure To Plead State Action Also Requires
Dismissal Of Their Crimes Against Humanity Claims..................... 27

C.      No Plaintiff Has Adequately Pled Claims For War Crimes And
Crimes Against Humanity. ................................................. 30

1.      No Plaintiff Has Alleged Sufficient Facts To Show That
The Killing At Issue Constituted A War Crime Or Crime
Against Humanity. .................................................. 30

2.      Plaintiffs' FARC Claims Fail For The Same Reasons. ........... 34

IV.     Plaintiffs Failed To Plead Any Theory Of Secondary Liability By
Which Chiquita Could Be Held Liable For Torts Committed By The
Colombian Armed Groups........................................................ 35

A.      Plaintiffs Must Allege That Chiquita Acted With The Purpose
Of Facilitating The Colombian Groups' Violations Of
International Law. ........................................................ 35

1.      International Law Dictates The Elements Of Aiding-
And-Abetting Liability And Requires Allegations That
The Defendant Acted With The Purpose Of Facilitating
The International Law Violation................................. 36

2.      Plaintiffs' Arguments For A "Knowledge" Standard Are
Unpersuasive....................................................... 37

B.      No Plaintiff Pleads Facts Sufficient To Link Chiquita To The
Tort For Which That Plaintiff Seeks Relief. ........................... 38

C.      Plaintiffs Fail To Plead Any Facts Supporting A Plausible
Inference That Chiquita Acted With The Purpose of Supporting
These Groups' Violent Acts............................................... 41

V.      Plaintiffs Concede That Their TVPA Claims Must Be Dismissed. ............. 46

iv

VI.   Plaintiffs' Cross-Appeal Lacks Merit................................................ 47

    A.   The Cross-Appeal Should Be Dismissed Because It Does Not Satisfy The Standard For Interlocutory Appeal. ................................ 47

    B.   Plaintiffs' Non-Federal Tort Claims May Proceed, If At All, Only Under Colombian Law. ................................................. 48

        1.   None of the Forum States Can Apply Its Laws To Plaintiffs' Claims. .................................................. 48

        2.   The Choice-of-Law Rules On Which Plaintiffs Rely Point To Colombian Law. ........................................... 54

CONCLUSION ...................................................................................... 56

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**[*]

*Abagninin v. AMVAC Chem. Corp.*,
  545 F.3d 733 (9th Cir. 2008) ...........................................................................28

*Abdelhamid v. Altria Group, Inc.*,
  515 F. Supp. 2d 384 (S.D.N.Y. 2007) ..............................................................56

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302, 101 S. Ct. 633 (1981)...........................................................49, 50

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396, 123 S. Ct. 2374 (2003)..............................................................51

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40, 119 S. Ct. 977 (1999)...................................................................23

*\*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009)..................................................17, 33, 41

*Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*,
  68 F.3d 409 (11th Cir. 1995) ............................................................................18

*Aziz v. Alcolac Inc.*,
  658 F.3d 388 (4th Cir. 2011) ......................................................................36, 37

*\*Balintulo v. Daimler AG*,
  __ F.3d __, 2013 WL 4437057 (2d Cir. Aug. 21, 2013)............................*passim*

*Baloco v. Drummond Co.*,
  640 F.3d 1338 (11th Cir. 2011) ........................................................................54

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)...............................................................19

---

[*] Authorities upon which this brief chiefly relies are marked with asterisks.

*Bishop v. Fla. Specialty Paint Co.*,
  389 So. 2d 999 (Fla. 1980) ..............................................................55

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288, 121 S. Ct. 924 (2001)................................................27

*Burton v. Wilmington Parking Auth.*,
  365 U.S. 715, 81 S. Ct. 856 (1961)..................................................23

*Cabello v. Fernández-Larios*,
  402 F.3d 1148 (11th Cir. 2005) ........................................................37

*Doe I v. Unocal Corp.*,
  395 F.3d 932 (9th Cir. 2002) ............................................................37

*Doe I v. Unocal Corp.*,
  395 F.3d 978 (9th Cir. 2003) ............................................................37

*Doe v. Exxon Mobil Corp.*,
  __ F. App'x __, 2013 WL 3970103 (D.C. Cir. July 26, 2013) ..........37

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011)............................................................37

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244, 111 S. Ct. 1227 (1991).........................................7, 14

*Gant v. Wallingford Bd. of Educ.*,
  69 F.3d 669 (2d Cir. 1995) ...............................................................42

*Gerling Global Reinsurance Corp. of Am. v. Gallagher*,
  267 F.3d 1228 (11th Cir. 2001) ..................................................49, 50

*Griffin Indus., Inc. v. Irvin*,
  496 F.3d 1189 (11th Cir. 2007) ........................................................42

*Hines v. Davidowitz*,
  312 U.S. 52, 61 S. Ct. 399 (1941)....................................................50

*Jackson v. Metro. Edison Co.*,
  419 U.S. 345, 95 S. Ct. 449 (1974)..................................................23

*Jones v. Clinch*,
 __ A.3d__, 2013 WL 3940814 (D.C. Aug. 1, 2013) ...........................................56

*Kadic v. Karadzic*,
 70 F.3d 232 (2d. Cir. 1994) ...............................................................................27

*Kiobel v. Royal Dutch Petroleum Co.*,
 133 S. Ct. 1659 (2013) ................................................................................*passim*

*Mamani v. Berzain*,
 654 F.3d 1148 (11th Cir. 2011) ..................................................................*passim*

*McFarlin v. Conseco Servs., LLC*,
 381 F.3d 1251 (11th Cir. 2004) .........................................................................47

*Membreño v. Costa Crociere S.P.A.*,
 425 F.3d 932 (11th Cir. 2005) ...........................................................................54

*Microsoft Corp. v. AT&T Corp.*,
 550 U.S. 437 (2007).............................................................................................14

*Mohamad v. Palestinian Auth.*,
 132 S. Ct. 1702 (2012)..................................................................................17, 46

*Morrison v. Nat'l Australia Bank Ltd.*,
 130 S. Ct. 2869 (2010)................................................................................*passim*

*N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*,
 163 F.3d 449 (7th Cir. 1998) .............................................................................42

*Nat'l Broad. Co., Inc. v. Commc'ns Workers of Am., AFL-CIO*,
 860 F.2d 1022 (11th Cir. 1988) .........................................................................23

*Neely v. Club Med Mgmt. Servs.*,
 63 F.3d 166 (3d Cir. 1995) ................................................................................53

*Nieman v. Dryclean U.S.A. Franchise Co.*,
 178 F.3d 1126 (11th Cir. 1999) .........................................................................10

*P.V. ex rel. T.V. v. Camp Jaycee*,
 962 A.2d 453, 455 (N.J. 2008) ..........................................................................55

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ......................................................................*passim*

*Prosecutor v. Perisic*,
    Case No. IT-04-81-T (Feb. 28, 2013)...............................................38

*Rodrigues v. CNP of Sanctuary, LLC.*,
    __ F. App'x __, 2013 WL 3490393 (11th Cir. July 12, 2013)...........................48

*Romero v. Drummond Co.*,
    552 F.3d 1303 (11th Cir. 2008) ..................................................................*passim*

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009)......................................................................51

*Scotts Co. v. Hacienda Loma Linda*,
    2 So. 3d 1013 (Fla. Dist. Ct. App. 2008)..........................................................56

*Scotts Co. v. Hacienda Loma Linda*,
    942 So. 2d 900 (Fla. Dist. Ct. App. 2006).......................................................56

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009) ..................................................................*passim*

*Sosa v. Alvarez-Machain*,
    542 U.S. 692, 124 S. Ct. 2739 (2004)........................................................*passim*

*Talbot v. Jansen*,
    3 U.S. (3 Dall.) 133 (1795) ..................................................................9

*United States v. Belmont*,
    301 U.S. 324, 57 S. Ct. 758 (1937)...................................................................51

*United States v. Jones*,
    29 F.3d 1549 (11th Cir. 1994) .......................................................................44

*United States v. Seher*,
    562 F.3d 1344 (11th Cir. 2009) ......................................................................38

*Zschernig v. Miller*,
    389 U.S. 429, 88 S. Ct. 666 (1968).................................................................51

**Constitution, Statutes, and Rule**

U.S. Const., Art. VI ..................................................................50, 51, 52

U.S. Const., Amend. XIV ...............................................................49, 50

*Alien Tort Statute, 28 U.S.C. § 1350 ............................................*passim*

28 U.S.C. § 1292(b) ............................................................................47

42 U.S.C. § 1983 ..........................................................................23, 27

50 U.S.C. § 1701 ...............................................................................13

Fed. R. Civ. P. 23 ..............................................................................19

**Other Authorities**

Charles Alan Wright, et al.,
*Federal Practice & Procedure* (3d ed. 2013) .....................................18

M. Cherif Bassiouni,
*Crimes Against Humanity: Historical Evolution and
Contemporary Application* (2011) ......................................................29

David Luban,
*A Theory of Crimes Against Humanity*, 29 Yale J. Int'l L. 85 (2004) ..............28

Restatement (Second) Conflict of Laws .............................................49, 55

Restatement (Third) of the Foreign Relations Law ..................................52

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's ruling would permit more than 4,000 Colombians to pursue in a U.S. court claims for acts of violence committed by Colombians in Colombia allegedly with assistance from Colombia's current President.  Seeking billions of dollars in damages, those claims would impose enormous burdens on the federal courts, present discovery challenges of extraordinary proportions, and represent an unprecedented expansion of the jurisdiction afforded by the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").

The district court permitted *all* 4,000 plaintiffs to proceed based on its mistaken conclusion that *a few* of them satisfied the ATS pleading requirements. This decision, which opens the floodgates to thousands of claims that no one disputes were inadequately pled, will have profound implications for the federal courts and for U.S. foreign policy, and simply cannot be squared with this Court's admonition that, in ATS cases, "judicial restraint is demanded" and "judicial creativity is not justified."  *Mamani v. Berzain*, 654 F.3d 1148, 1156-57 (11th Cir. 2011).

I.  After *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), there can be no dispute that, consistent with the established presumption against extraterritoriality, the ATS does not confer jurisdiction for claims "seeking relief

for violations of the law of nations occurring outside the United States." *Id.* at 1669.  Plaintiffs' efforts to displace that presumption are futile.

To determine whether the presumption against extraterritoriality is displaced, a court must consider whether the conduct that was the "focus" of congressional concern—torts committed in violation of the law of nations— occurred in the United States.  Here those torts occurred  in Colombia, not in the United States.  Congress's "focus" in enacting the ATS did not include conduct giving rise to secondary liability for torts committed abroad.   Even if that were not the case, plaintiffs' reliance on theories of secondary liability would fall short.  The domestic conduct alleged here is less substantial than conduct that the Supreme Court and this Court have previously deemed insufficient to displace the presumption.  Plaintiffs' assertion that *Kiobel* created a new, more liberal presumption against extraterritoriality for ATS cases lacks merit.

II.  Plaintiffs do not deny that the vast majority of the more than 4,000 plaintiffs failed to plead cognizable ATS claims.  Instead, they argue that, based solely on a review of a handful of complaints, the district court had discretion to allow *every* plaintiff to pursue his or her claims.  Indeed, trumpeting what they characterize as a "common-sense case management approach," plaintiffs embrace the district court's abdication of its gatekeeper responsibility.  A district court has

2

jurisdiction over an ATS claim only if it is properly pled.  If a plaintiff does not state a claim under the ATS, his claims must be dismissed.

III.  Because no plaintiff has alleged facts sufficient to establish that the Colombian armed groups violated international law, even the "representative" plaintiffs have failed to state claims under the ATS.

Plaintiffs have not adequately alleged facts sufficient to establish the state action required for claims of extrajudicial killing or torture.  In order to survive a motion to dismiss, a plaintiff must allege a link between the government and the "conduct at issue," *i.e.*, the specific act of extrajudicial killing or torture alleged in the complaint.  None of the plaintiffs has done so.

Plaintiffs' claims for crimes against humanity also fail adequately to plead state action.  Some international tribunals have recently relaxed the state action requirement for crimes against humanity, but there is no international law consensus on that issue.  As a result, ATS claims for crimes against humanity are still governed by traditional principles that require state action, which has not been adequately pled here.

Plaintiffs' war crimes and crimes against humanity claims fail because they have not alleged facts sufficient to establish that the alleged acts of killing or torture were committed in the course of hostilities (as required for war crimes) or as part of a widespread or systematic attack (as required for crimes against

humanity). The few plaintiffs who make specific allegations in an effort to satisfy this requirement fall short; the facts alleged, even if assumed to be true, do not show that the victims were killed because of, rather than simply during, an armed conflict, or as part of a widespread, systematic attack. Plaintiffs' claims based on violence by left-wing guerilla groups fail for the same reasons.

IV. No plaintiff has properly pled a secondary liability theory to hold Chiquita liable for the acts of the Colombian armed groups.

Chiquita cannot be held liable for aiding and abetting based solely on allegations that Chiquita knew that its actions would assist the Colombian groups' international law violations. The Second and Fourth Circuits have both expressly rejected this "knowledge" standard. To state a claim based on aiding and abetting, plaintiffs must allege that Chiquita acted with the "purpose" of facilitating acts of violence in violation of international law.

The district court erred in holding that plaintiffs had adequately alleged that Chiquita acted with the required purpose. Allegations that Chiquita generally supported the Colombian groups' goals are insufficient to satisfy this requirement. No plaintiff alleges facts that, if true, would establish that Chiquita acted with the purpose of facilitating the specific international law violation for which that plaintiff sought relief. The allegations of payments to the AUC are insufficient; they equally support the inference that Banadex, Chiquita's Colombian subsidiary,

paid the groups to protect its employees.  The allegations of arms and drugs

smuggling are insufficient; they support the equally plausible inference that

Chiquita was a victim of those activities.  The allegations all fall short because they

fail to link Chiquita to any victim in time or place.

V.  Plaintiffs concede that their TVPA claims must be dismissed.

VI.  Plaintiffs' cross-appeal should be dismissed and, in any event, lacks

merit.

Plaintiffs' cross-appeal does not present a controlling question of law that

may advance the ultimate termination of the litigation.  Plaintiffs acknowledge that

the district court may have been correct in holding that Colombian law, rather than

state law, governs their non-federal claims; they argue only that the choice-of-law

determination should be made later in the case.  The cross-appeal should therefore

be dismissed.

In any event, the district court correctly held that plaintiffs' non-federal tort

claims cannot proceed under state law.  The court cannot presume that plaintiffs'

claims are governed by the law of the forum in which they were brought because

applying forum law would violate both domestic and international law.  Moreover,

the choice-of-law principles on which plaintiffs rely require application of

Colombian law.  For claims involving personal injuries, each forum state generally

applies the law of the place of injury.  The forum states would follow that general rule here and apply Colombian law.

## ARGUMENT

I.  **Plaintiffs' ATS Claims Must Be Dismissed Under *Kiobel*.**

Plaintiffs suggest that their ATS claims are based on conduct in the United States.  But the international law violations they have pled—extrajudicial killing, torture, war crimes, and crimes against humanity—all occurred in Colombia.  In *Kiobel*, the Supreme Court applied the presumption against extraterritoriality to hold that a federal court may not "recognize a cause of action under the [ATS] for violations of the law of nations occurring within the territory of a sovereign other than the United States."  133 S. Ct. at 1662, 1669.  That holding requires dismissal of plaintiffs' remaining ATS claims.

Plaintiffs attempt to distinguish *Kiobel* on numerous grounds, but none has merit, as the Second Circuit recently held in rejecting virtually all of plaintiffs' arguments.  *See Balintulo v. Daimler AG*, __ F.3d __, 2013 WL 4437057 (2d Cir. Aug. 21, 2013).  For example, in *Balintulo*, as here, the plaintiffs sought to displace the presumption against extraterritoriality on the ground that the defendants were U.S. corporations that allegedly aided and abetted from the United States international law violations that occurred abroad.  *Id.* at *2-3, *8.  The Second Circuit rejected that argument and held that the presumption against

6

extraterritoriality barred plaintiffs' claims. *Id.* at *7-9. *Kiobel* requires the same result here.

> ### A.   Chiquita's Limited Domestic Conduct Is Insufficient To Displace The Presumption Against Extraterritoriality.

In *Kiobel*, the Supreme Court squarely held that the presumption against extraterritoriality applies to the ATS. 133 S. Ct. at 1664-69. In so holding, the Court relied extensively on *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), which provides that the presumption against extraterritoriality may be displaced if the conduct that was "the 'focus' of congressional concern"—not merely *some* domestic activity—occurred in the United States. *Id.* at 2884 (*quoting EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255, 111 S. Ct. 1227, 1234 (1991)); *see also id.* ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." (emphasis in original)).

1.  The text of the ATS itself establishes that the "focus of congressional concern" was "tort[s] . . . committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Plaintiffs disagree, arguing that Congress's focus "was to fulfill U.S. responsibility to vindicate the law of nations, including ensuring that the United States would provide redress when U.S. persons

committed violations of international law."  Pls. Br. 27; Wolf Br. 24-26.[1]  But

plaintiffs cite nothing in the statutory text or its legislative history to support this

interpretation.  Instead, they rely (Pls. Br. 27) on an inapposite footnote in *Sosa v.*

*Alvarez-Machain*, 542 U.S. 692, 722. n.15, 124 S. Ct. 2739, 2760 n.15 (2004).

The footnote does not even address the ATS—it discusses instead the Continental

Congress's recommendation that states enact criminal statutes for violations of the

law of nations.  *Id.*

Plaintiffs argue that, even if Congress's focus was on the "tort" itself,  its

concern embraced not only the violent conduct constituting a violation of

international law but also any related theories of secondary liability.  Pls. Br. 28-

29.  This argument squarely conflicts with plaintiffs' treatment of secondary

liability elsewhere in their brief.  Plaintiffs contend that, even though international

norms determine the elements of the violation itself, federal common law

determines the elements of secondary liability.  *Id.* at 54-55.  Thus, in plaintiffs'

view, theories of secondary liability are not only separate from the underlying tort,

but are also governed by different bodies of law.

---

[1] The consolidated brief joined by most plaintiffs in the case is referenced as "Pls. Br."; the separate brief filed by Paul Wolf on behalf of plaintiffs in certain cases is referenced as "Wolf Br."  References to the district court record ("Doc.") are to the multi-district litigation docket, No. 08-md-01916, unless otherwise noted.

Plaintiffs are wrong that secondary liability is determined by domestic law, *see infra* Part IV.A.1, but, even if that were true, Congress's focus on the "tort" would not include theories of secondary liability. This Court and others have repeatedly recognized that whether an ATS tort was committed is a question distinct from the subordinate issue of who may be held liable for the tort. *Mamani*, 654 F.3d at 1154 ("[B]efore we decide who can be held responsible for a tort, we must look to see if an ATS tort has been pleaded at all."); *Balintulo*, 2013 WL 4437057, at *8. As the Second Circuit explained, "[t]o hold otherwise would conflate the extraterritoriality analysis—which asks where the 'violation[] of the law of nations occur[red],'—with the question of derivative liability." *Id.* at *8 n.28 (quoting *Kiobel*, 133 S. Ct. at 1669).[2]

Plaintiffs' claims must be dismissed because all of the conduct that was the focus of Congress' concern occurred "within the territory of a sovereign other than the United States." *Kiobel*, 133 S. Ct. at 1662. Plaintiffs argue that "Chiquita acted in the United States" (Pls. Br. 24-26)—*i.e.*, "that *some* domestic activity is involved in the case"—but their allegations of domestic conduct relate only to their

---

[2] Plaintiffs argue that *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795), demonstrates that the ATS provides liability "when persons inside the United States . . . abet law of nations violations committed abroad." Pls. Br. 28-29. But *Talbot* involved unlawful seizure of a ship *on the high seas*. *See* 3 U.S. (3 Dall.) at 156. Recognition of a cause of action for piracy on the high seas does not support recognition of a cause of action for torts within the territory of a foreign sovereign. *Kiobel*, 133 S. Ct. at 1667.

theories of secondary liability.  Doc. 412:9.  The conduct alleged to establish an "offense against the law of nations"—extrajudicial killing, torture, war crimes, or crimes against humanity—involved acts "by Colombian paramilitaries against Colombian civilians that occurred inside Colombia."  *Id.* at 87.  The presumption against extraterritoriality therefore bars these claims.

2. Even if Congress's "focus" in enacting the ATS included secondary liability, plaintiffs' claims would be barred.  The domestic conduct alleged in this case is neither necessary nor sufficient to establish the international law violations on which plaintiffs' claims are based.  Those claims are premised on completed violations of international law in Colombia.  Chiquita's decision to pay Colombian armed groups in Colombia is not an element of any alleged international law violations, and it does not, standing alone, establish secondary liability.  Chiquita Br. 24-26.  The domestic conduct alleged here is therefore less substantial than the conduct that the Supreme Court and this Court have previously deemed insufficient to displace the presumption.  *Id.* at 27-29 (discussing *Morrison*, 130 S. Ct. at 2883-84, 2888; *Nieman v. Dryclean U.S.A. Franchise Co.*, 178 F.3d 1126, 1128, 1129 & n.4 (11th Cir. 1999)).  In those cases, the presumption against extraterritoriality was not displaced even though the domestic conduct was *necessary* to establish a violation of the law at issue.  *Id.*

**B.      Plaintiffs' Attempts To Create And Apply A New Presumption Fail.**

Unable to displace the presumption against extraterritoriality under traditional principles and established precedents, plaintiffs contend that *Kiobel* adopted a "new presumption," with much more liberal standards, for ATS cases. Pls. Br. 19-20, 26-27.  Plaintiffs further argue that their claims displace the new *Kiobel* presumption for many reasons.  Their arguments lack merit.

**1.      *Kiobel* Does Not Create A New Presumption.**

Plaintiffs contend that, departing from its decision in *Morrison*, the *Kiobel* Court created a new extraterritoriality test for ATS cases.  Under plaintiffs' reading of *Kiobel*, gates to American courts would be open for ATS claims that "touch and concern" the United States; all other limiting principles and standards articulated by *Morrison* and other extraterritoriality decisions may be disregarded.  Pls. Br. 19-20.[3]

This argument ignores the *Kiobel* majority's extensive reliance on *Morrison*, which is cited eight times in its eight-page opinion.  Nothing in *Kiobel* suggests

---

[3] Plaintiffs' *amici* not only argue that *Kiobel* creates a new test, but suggest that the Court intended to replace the presumption against extraterritoriality with a case-by-case analysis grounded in international law.  Br. of *Amici Curiae* Int'l Law Scholars 4-18.  It is irrational to conclude that the Court devoted the vast majority of its opinion to an explanation of why the presumption against extraterritoriality applied, and then—in a single sentence of dicta at the end of the opinion—created a new test indistinguishable from the test that Justice Breyer would have applied in the first instance.

11

that the Court intended to depart from *Morrison* or to create a new test of any kind. Indeed, the Court specifically cited *Morrison* to support the dicta on which plaintiffs rely for their new test: "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. *See Morrison*, 561 U.S. __, 130 S. Ct. at 2882-86." *Kiobel*, 133 S. Ct. at 1669; *see Balintulo*, 2013 WL 4437057, at *7 & n.25 (noting that the "touch and concern" language is dicta).[4] The Court's reliance on *Morrison* demonstrates that it did not create a "new presumption," but rather that ATS claims are governed by the same presumption that applies to all statutes lacking extraterritorial reach.[5]

---

[4] The Court cited the portion of *Morrison* that instructs courts to apply the presumption by determining whether the conduct that was "the 'focus' of congressional concern" occurred in the United States, and also informs them that the presumption is not displaced whenever some domestic conduct is involved. *See Morrison*, 130 S. Ct. at 2882-86.

[5] Given the absence of any domestic conduct in *Kiobel*, the Court had no need to apply *Morrison* to the facts before it to hold that the plaintiffs' claims were barred. Justice Alito's concurrence nevertheless applies *Morrison* and concludes that the presumption is not displaced "unless the domestic conduct is sufficient to violate an international law norm that satisfies" the *Sosa* standard. *Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). Contrary to plaintiffs' assertion, the other Justices did not reject this analysis. *See Balintulo*, 2013 WL 4437057, at *7 n.26 (noting that the majority "simply left open" the reach of ATS causes of action involving some domestic conduct (citing *Kiobel*, 133 S. Ct. at 1669)).

### 2.    The Presumption Is Not Displaced By The Factors On Which Plaintiffs Rely.

Plaintiffs contend that the new *Kiobel* presumption is displaced for numerous reasons, but none withstands scrutiny.

***Chiquita's Plea Agreement.***  Plaintiffs contend that Chiquita's plea agreement demonstrates that "the U.S. government has concluded that providing support to the AUC directly concerns vital national interests."  Pls. Br. 20; Wolf Br. 23.  But the issue under *Kiobel* is not whether providing support to the AUC concerns U.S. "national interests"; it is whether the relevant conduct occurred in the *territory* of the United States.  *See supra* Part I.A;  *Kiobel*, 133 S. Ct. at 1669.

Chiquita's plea does not displace the presumption against extraterritoriality. The plea was based on a criminal statute, the *International* Emergency Economic Powers Act, that itself applies extraterritorially.  50 U.S.C. §1701 (authorizing the President to prohibit conduct that "has its source in whole or substantial part outside the United States").  A plea agreement under a criminal statute with extraterritorial reach does not suggest that the underlying conduct is subject to liability under a civil statute that does not have extraterritorial application.

In any event, the conduct underlying the plea is not the conduct that shapes the extraterritoriality analysis under the ATS.  Plaintiffs asserted ATS claims for providing material support to the AUC—*i.e.*, claims that did not depend on the commission of a tort in Colombia—but the district court correctly held that these

13

"terrorism-based claims" did not satisfy the *Sosa* standard. Doc. 412:18-31.

Plaintiffs did not appeal this ruling, and their remaining ATS claims are based on

alleged violations of international law *in Colombia*.

  ***Chiquita's U.S. Citizenship.*** Plaintiffs also contend that their asserted

"new" *Kiobel* presumption is displaced whenever the defendant is a U.S. citizen.

Pls. Br. 21-24, 27; Wolf Br. 17-20. But nothing in *Kiobel* "suggests that the rule of

law it applied somehow depends on a defendant's citizenship." *Balintulo*, 2013

WL 4437057, at *7 n.24. As the Second Circuit explained, "the presumption of

extraterritoriality traditionally has focused on the site of the conduct, not the

identity of the defendant." *Id.* (quotation marks and citation omitted).

  In *Morrison*, the defendants included U.S. citizens and corporations, but the

Supreme Court did not limit its holding to the claims brought against the foreign

defendants. 130 S. Ct. at 2875, 2882-86. Without distinguishing between the

defendants based on nationality, the Court held that the claims could not proceed

because they were based on foreign conduct. *Id.* The Court has similarly

dismissed other claims against U.S. citizens on extraterritoriality grounds. *See*

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-56 (2007) (presumption against

extraterritoriality barred claims against Microsoft, a U.S. corporation, based on its

alleged conduct overseas); *Arabian Am. Oil Co.*, 499 U.S. at 246-47, 111 S. Ct. at

1229 (presumption against extraterritoriality dictates that Title VII does not

"regulate the employment practices of United States employers who employ

United States citizens abroad").

Plaintiffs make no attempt to square their argument with *Kiobel* or

*Morrison*.  Instead, they argue that their view is consistent with the views

expressed in Justice Breyer's concurring opinion and the Solicitor General's

*amicus* brief in *Kiobel*.  Pls. Br. 21-22; Wolf Br. 23-24.  But the Supreme Court did

not adopt either of these proposed case-by-case approaches.  It applied the

traditional presumption against extraterritoriality without "suggest[ing] that a

defendant's citizenship has any relevance to the presumption."  *Balintulo*, 2013

WL 4437057, at *7 n.24.[6]

**_Foreign policy considerations._**  Plaintiffs' argument (Pls. Br. 29-31) that

their claims are consistent with U.S. foreign policy is both incorrect and irrelevant.

Plaintiffs' claims clearly have significant foreign policy implications because they

are premised on allegations that the current and former presidents of Colombia, a

key U.S. ally, were complicit in the murders of thousands of Colombians.  *See*

*Sosa*, 542 U.S. at 727, 124 S. Ct. at 2763 (noting foreign-policy implications of

---

[6] Plaintiffs' reliance on the "Bradford Opinion" is also misplaced.  Pls. Br. 23-24.
*Kiobel* explained that the Opinion "defies a definitive reading" and "hardly suffices
to counter the weighty concerns underlying the presumption against
extraterritoriality."  133 S. Ct. at 1668.

claims imposing "a limit on the power of foreign governments over their own citizens").

In any event, plaintiffs' "case-specific policy arguments miss the mark." *Balintulo*, 2013 WL 4437057, at *8. *Kiobel*'s holding that the presumption against extraterritoriality applies to the ATS makes it unnecessary for judges to determine on a case-by-case basis the extent to which an ATS claim conflicts with U.S. foreign policy. In rejecting similar policy-based arguments, the Second Circuit explained that "a common-law cause of action brought under the ATS cannot have extraterritorial reach simply because some judges, in some case, conclude that it should." *Id.*; *see also Morrison*, 130 S. Ct. at 2881 ("Rather than guess anew in each case, we apply the presumption in all cases . . . .").

*      *      *

In sum, plaintiffs' ATS claims cannot displace the presumption against extraterritoriality because they are based on "violations of the law of nations occurring within the territory of a sovereign other than the United States." *Kiobel*, 133 S. Ct. at 1662, 1669. They must be dismissed.

## II.    The District Court Lacked Discretion To Deny The Motion To Dismiss For Each Plaintiff Who Failed To Plead A Cognizable Claim.

There is no dispute that the vast majority of plaintiffs failed to plead cognizable ATS claims. Many provided only "brief, undetailed" allegations to support their claims; others alleged facts that affirmatively disprove their claims.

16

Chiquita Br. 13, 29-31, 47-48.  Plaintiffs nevertheless contend that the district court acted within its discretion in sustaining all of the claims, including those that were not adequately pled, through a novel procedure they characterize as a "common-sense case management approach."  Pls. Br. 31-33.

A district court does not have discretion to deny a motion to dismiss *any* claim that is not properly pled.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (denial of motion to dismiss reviewed *de novo*), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012).  Plaintiffs cite no authority that supports the district court's approach, and Chiquita is aware of none.

Instead, plaintiffs rely on cases in which MDL courts chose not to rule on claim-specific issues.  Pls. Br. 33.  But that is not what the district court did here.  The court *denied* Chiquita's motion to dismiss as to every plaintiff.  And it did so using an unprecedented and fundamentally unprincipled approach:  The district court (a) considered the claims of a handful of plaintiffs, (b) concluded that those plaintiffs had adequately pled their claims, and then  (c) "assumed" that their allegations were "representative of all Plaintiffs' claims."  Doc. 412:6 n.4.  That approach is contrary to this Court's prior decisions, which hold that the "mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal*, 578 F.3d at 1261 (citing *Ashcroft v. Iqbal*, 556 U.S. 662,

678, 129 S. Ct. 1937, 1949 (2009)).  And it is fundamentally inconsistent with the

"vigilant doorkeeper" responsibility with which federal courts have been charged

in ATS cases.  *Mamani*, 654 F.3d at 1152 (citing *Sosa*, 542 U.S. at 729, 124 S. Ct.

at 2764).

Moreover, unlike the cases on which plaintiffs rely—none of which involved

ATS claims—the district court could not have declined to rule on the motions to

dismiss.  Chiquita's motions directly challenged the district court's jurisdiction to

adjudicate the ATS claims,  Doc. 412:11, and federal courts must ensure that they

have jurisdiction "before proceeding further."  *Atlanta Gas Light Co. v. Aetna Cas.

& Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995); *see also* Charles Alan Wright, et al.,

5C *Federal Practice & Procedure* § 1393 (3d ed. 2013).[7]

Plaintiffs contend that the district court could have allowed all plaintiffs to

pursue their claims and then returned the cases to the transferor courts for

resolution of the threshold jurisdictional issue.   Pls. Br. 33.  That argument is a

non-starter.  As the Supreme Court has explained, "[i]t is no answer to say that a

claim just shy of a plausible entitlement to relief can, if groundless, be weeded out

in the discovery process," or "by careful scrutiny of evidence at the summary

---

[7] Plaintiffs are wrong in suggesting that Chiquita endorsed the district court's
approach.  Pls. Br. 33.  Chiquita merely acknowledged that the court possessed
case management tools that would have obviated the need to issue opinions
addressing each individual claim.  Chiquita Br. 31 n.6.

judgment stage." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967 (2007) (internal quotation marks and citation omitted).[8]

Plaintiffs' reliance on class-action principles fares no better. The Federal Rules of Civil Procedure authorize a plaintiff to serve as a "representative" of other plaintiffs if certain rigorous requirements are met. Fed. R. Civ. P. 23(a). But that rule does not suggest, as plaintiffs assert, that a plaintiff need not sufficiently plead his own claims if he files a putative class action. Pls. Br. 33-34 & n.8. That is especially so here because a properly pled ATS claim is required for the court to have jurisdiction. *See Sosa*, 542 U.S. at 724, 124 S. Ct. at 2761.

In short, had each plaintiff filed his own complaint, his claims would indisputably rise or fall based on the sufficiency of the allegations in that complaint. A plaintiff cannot avoid the applicable pleading standards simply by joining his claims with those of hundreds of other plaintiffs. The court should have dismissed the claims that are not adequately pled.

---

[8] Chiquita does not argue, as plaintiffs suggest, that this Court must weed out the invalid claims by deciding each claim. Pls. Br. 34. This Court need resolve only the legal question whether federal law permits the district court's "representative" pleading approach, or whether each plaintiff must sufficiently plead his own claims.

19

**III.   Plaintiffs Failed To Allege Sufficient Facts To Establish That The Colombian Armed Groups Violated International Law.**

   **A.   No Plaintiff Has Adequately Pled The State Action Necessary To Support Claims For Extrajudicial Killing Or Torture.**

A plaintiff asserting ATS claims for extrajudicial killing or torture must establish "state action." *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008). When a claim requiring state action is based on conduct by a private actor, "there must be proof of a symbiotic relationship between [the] private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action." *Id.* The district court erred in holding that each of the more than 4,000 plaintiffs had adequately pled state action based on allegations of "a symbiotic relationship between the Colombian government and the AUC with respect to the AUC's campaign of torture and killing of civilians in the banana-growing regions." Doc. 412:38-39.

   **1.   Under This Court's Prior Decisions, A Plaintiff Must Connect The Alleged State Action To The Act Of Violence That Forms The Basis Of That Plaintiffs' Claim.**

Plaintiffs do not deny that none of their allegations specifically links the Colombian government to any of the more than 4,000 deaths or injuries at issue. As Chiquita explained (Chiquita Br. 35-36), the district court concluded that plaintiffs had sufficiently pled state action by relying almost exclusively on the same generalized allegations that this Court had already held are insufficient.

20

*Compare, e.g.*, Doc. 412:39 (crediting allegation that "the AUC and other paramilitary groups in fact collaborated closely with the Colombian government"), *with Sinaltrainal*, 578 F.3d at 1266 (rejecting as insufficient the allegation that the Colombian government "cooperate[d], protect[ed] and/or work[ed] in concert with" the AUC). For the few allegations that actually describe government involvement in particular acts of violence, there are no allegations that identify which plaintiffs, if any, assert claims based on those incidents. Chiquita Br. 36. Plaintiffs do not dispute any of this.

Plaintiffs instead contend that *Romero* and *Sinaltrainal* require only that they allege a link between the Colombian government and the "AUC's campaign of terror." Pls. Br. 39-41. They disclaim any obligation to allege a link between the Colombian government and the specific killings or acts of torture upon which each plaintiff's claims are based. *Id.*; *see also* Wolf Br. 31-34.

Nothing in *Romero* or *Sinaltrainal* supports plaintiffs' broad and vague characterization of the "conduct at issue" requirement. Both decisions make clear that the "conduct at issue" is the specific act of torture or extrajudicial killing alleged in the complaint. In *Romero*, the plaintiffs' "proof of a general relationship" between the AUC and the Colombian government was "not enough" to establish state action because there was no "evidence of state action regarding *the murders described in the complaint*." 552 F.3d at 1317-18 (emphasis added).

21

In *Sinaltrainal*, the Court similarly required "allegations of a symbiotic relationship that involves *the torture or killing alleged in the complaint*."  578 F.3d at 1266 (emphasis added) (quotation marks and citation omitted).  The Court held that the plaintiffs had failed to plead state action—despite extensive allegations that the Colombian government cooperated, assisted, and worked in concert with the paramilitaries—because there was "no suggestion the Colombian government was involved in, much less aware of, the murder and torture alleged in the complaints."  *Id.*

Plaintiffs' broad characterization of the "conduct at issue" also conflicts with *Mamani*, which held that plaintiffs had not adequately pled ATS claims because they did not allege "facts connecting what these defendants personally did to the *particular alleged wrongs*."  654 F.3d at 1155 n.8 (emphasis added).  Plaintiffs argue (Pls. Br. 40) that "state action was not even in question" in *Mamani* because the suit in that case was brought directly against government officials, but that ignores the fact that plaintiffs asserted claims requiring proof of state action.  That the Court did not address whether private conduct could be treated as state action is irrelevant.  If a plaintiff who sues a government official directly must connect the defendant to the particular alleged wrongs, there is no reason for a more relaxed

requirement when a plaintiff attempts to establish state action through a more attenuated theory.[9]

Plaintiffs further contend (Pls. Br. 40-41) that they can establish state action without alleging that the government had any involvement in the "conduct at issue." Relying on *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S. Ct. 856 (1961), plaintiffs argue that state action is present so long as the state has "endorsed" the private conduct as part of "a mutually beneficial relationship." Pls. Br. 41. Neither the Supreme Court nor this Court has ever taken such a broad view of state action under § 1983, much less under the ATS. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358, 95 S. Ct. 449, 457 (1974) (noting that the "actual holding" in *Burton* is limited to "lessees of public property"); *Nat'l Broad. Co., Inc. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1028 (11th Cir. 1988) (discussing *Jackson* and noting that "*Burton* itself refused to extend its holding even to all lessees of public property").[10]

None of this Court's (or the Supreme Court's) ATS decisions has ever relied on *Burton*. Instead, this Court has expressly held that "there must be proof of a

---

[9] The Wolf plaintiffs make no attempt to distinguish *Mamani* on this or any other issue. Indeed, they do not mention *Mamani* anywhere in their entire brief.

[10] Although *Burton* has not been overruled, the Supreme Court has carefully limited the decision to its specific facts, and has even acknowledged that *Burton*'s "vague" dicta has been "refined" by more recent rulings. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 57, 119 S. Ct. 977, 988 (1999).

symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action." *Romero*, 552 F.3d at 1317; *Sinaltrainal*, 578 F.3d at 1264 (same).

> ## 2.    A Plaintiff Must Connect The Alleged State Action To The Particular Act Of Violence Even When A Mass Atrocity Is Alleged.

Plaintiffs also argue that requiring a plaintiff to establish state action for the particular killing on which his claims are based would "ignore[] the mechanisms of mass atrocity in Colombia."  Pls. Br. 42.  According to plaintiffs, Chiquita has "carefully crafted" a standard that would require government leaders to "issue direct written orders for specific act[s] of violence."  *Id.*  Plaintiffs mischaracterize Chiquita's argument.  Chiquita does not dispute that state action could be present in the context of mass atrocity; nor does it argue that government officials must issue direct orders for specific acts of violence.

Instead, Chiquita argues that the test applied in *Sinaltrainal* should apply regardless of whether a suit involves a single plaintiff or hundreds who join their claims in a single suit.  Plaintiffs' decision to aggregate their claims into a handful of lawsuits does not change the nature of the individual claims or the proof required to establish each of them.  Nor does it bestow upon plaintiffs a collective right to ask a U.S. jury to sit in judgment of the Colombian government's relationship with the AUC.  Rather, each plaintiff in each lawsuit is seeking

damages relating to a different violent act.  Regardless of whether a suit is brought by one plaintiff or 4,000 plaintiffs, to show state action, each plaintiff must establish the state's involvement in the particular act of violence.  *Sinaltrainal*, 578 F.3d at 1264, 1266; *Romero*, 552 F.3d at 1317.

Plaintiffs have not sufficiently alleged a mass atrocity involving the Colombian government to sustain any of their claims, much less all of them.  The district court cited numerous allegations to support its holding that plaintiffs had sufficiently pled state action, Doc. 412:39-43, but only two involve mass atrocities: (1) the AUC and the 17th Brigade of the Colombian Army allegedly murdered five banana workers, *id.* at 42; and (2) the AUC and Colombian Army allegedly participated in a massacre in which 11 people were executed and 30 people were forcibly disappeared, *id*. at 43.  No plaintiff, however, alleges that his claims are brought on behalf of one of those victims.  Contrary to the district court's ruling, these allegations do not provide a basis for finding state action for any, much less each, of the more than 4,000 victims at issue here.

### 3.     Plaintiffs' Claims Have Significant Foreign Policy Implications.

Plaintiffs' assertion (Pls. Br. 44-47) that adjudicating their claims will not impinge on U.S. foreign policy is unpersuasive because plaintiffs "claim a limit on the power of foreign governments over their own citizens."  *Sosa*, 542 U.S. at 727, 124 S. Ct. at 2763.

Plaintiffs attempt to downplay the foreign policy implications by noting that the State Department has previously "called attention to collusion between Colombian officials and paramilitaries." Pls. Br. 44. But when the Supreme Court cautioned against allowing ATS claims to "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs," *Sosa*, 542 U.S. at 727, 124 S. Ct. at 2763, it did not suggest that caution is necessary only before the political branches address an issue. Even after the political branches express the views of the United States, continued caution is necessary to prevent the judiciary from expressing a conflicting view. For example, the State Department has never alleged, as plaintiffs do, that Colombia's sitting president was complicit in the murders of thousands of Colombians. A jury verdict implicating President Juan Manuel Santos would clearly have foreign policy implications.

### 4.    Plaintiffs Cannot Save Their Claims By Relying On Alternative State-Action Theories.

Contrary to plaintiffs' assertion (Pls. Br. 43), if the Court holds that plaintiffs have failed to plead state action under *Romero* and *Sinaltrainal*, it need not—and should not—remand to allow the district court to consider other state-action theories.

This Court has never suggested that a plaintiff who failed to allege government involvement in the killing or torture alleged in the complaint could nevertheless attempt to prove state action in some other way. To the contrary,

*Romero* holds that "there *must* be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action." 552 F.3d at 1317 (emphasis added).

Even if the Court looked to § 1983 cases, as plaintiffs suggest (Pls. Br. 43), the result would be the same. For all of the § 1983 tests, state action occurs "only if[] there is such a close nexus between the State and *the challenged action* that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 930 (2001) (emphasis added) (quotation marks and citation omitted).

### B. Plaintiffs' Failure To Plead State Action Also Requires Dismissal Of Their Crimes Against Humanity Claims.

Relying on *Kadic v. Karadzic*, 70 F.3d 232, 236 (2d. Cir. 1994), the district court held that claims for crimes against humanity do not require state action. Doc. 412:52. Plaintiffs do not defend the district court's reliance on *Kadic*. For good reason. *Kadic* was decided before *Sosa* and therefore did not answer the question required by *Sosa*: whether there is a sufficiently well-defined and established norm of international law prohibiting crimes against humanity absent state action. 542 U.S. at 732, 124 S. Ct. at 2765-66. Indeed, *Kadic* offers *no* analysis of the international law standard for crimes against humanity.

27

Plaintiffs suggest that the Ninth Circuit has held that state action is not required for crimes against humanity claims.  Pls. Br. 35.  That is not correct.  The Ninth Circuit recounted the history of crimes against humanity, acknowledging that "[t]he traditional conception regarding crimes against humanity was that a policy must be present and must be that of a State, as was the case in Nazi Germany."  *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 741 (9th Cir. 2008) (citation omitted).  The court noted the recent shift away from a state-action requirement, but did not decide whether these recent changes had become sufficiently well established to govern ATS claims because the parties had not raised the issue.  *Id.*

Plaintiffs are simply wrong in asserting a "modern consensus in international law" that state action is unnecessary.  Pls. Br. 35.  That assertion is refuted by their own discussion of the current state of international law, including the divergent approaches of the international tribunals that have addressed the state-action requirement.  *Id.* at 36.  Those divergent approaches reflect no consensus today, and certainly none at the time these violent acts were allegedly committed.

For example, the International Criminal Tribunal for Yugoslavia (ICTY) weakened the state-action requirement but did not eliminate it completely; it imposed an "armed conflict requirement[, which] still presupposes armies and government-like entities."  David Luban, *A Theory of Crimes Against Humanity*,

28

29 Yale J. Int'l L. 85, 96 (2004). And the International Criminal Court (ICC) has weakened the state action requirement but still requires crimes against humanity to be committed pursuant to a "state or organizational policy." *Id.* at 97. These "diverse formulations of [crimes against humanity] underscore the absence of an established consensus as to what developments have been accepted in customary international law since World War II, particularly as to the removal of the state policy element and the inclusion of nonstate actors within [crimes against humanity]." M. Cherif Bassiouni, *Crimes Against Humanity: Historical Evolution and Contemporary Application* 13 (2011).

Plaintiffs take no position on which of these or any other divergent formulations represents the current international law standard. Instead, they claim that they could satisfy any of them. That is not good enough under *Sosa*. Plaintiffs' inability to identify the governing international law standard demonstrates that none of the recent formulations satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations. 542 U.S. at 732, 124 S. Ct. at 2765-66. Unless and until such a consensus emerges, ATS claims are still governed by the traditional conception of crimes against humanity, which requires state action.

**C.    No Plaintiff Has Adequately Pled Claims For War Crimes And Crimes Against Humanity.**

This Court has previously considered allegations of torture and killings by the AUC in Colombia, and it held that plaintiffs failed to plead claims for war crimes based on those allegations. *Sinaltrainal*, 578 F.3d at 1267. The Court explained that non-state-action claims under the ATS must be narrowly construed to avoid opening federal courts to "all non-state torture claims occurring during [the] period of civil disorder." *Id.* The district court disregarded this instruction and held that plaintiffs' claims for war crimes and crimes against humanity could proceed without allegations of state action based on the same sort of general, conclusory allegations that were insufficient in *Sinaltrainal* and *Mamani*.

**1.    No Plaintiff Has Alleged Sufficient Facts To Show That The Killing At Issue Constituted A War Crime Or Crime Against Humanity.**

The overwhelming majority of plaintiffs have not alleged facts to show that the killing or torture they allege was committed in the course of hostilities (as required for a war crimes claim) or as part of a widespread or systematic attack (as required for a crimes against humanity claim). Indeed, more than 3,000 plaintiffs plead no facts whatsoever about their relatives' deaths or their injuries. Chiquita Br. 47. Other plaintiffs allege facts that affirmatively disprove their claims, including that the murders stemmed from personal grievances. *Id.* at 47-48. Plaintiffs do not dispute these points.

30

Plaintiffs instead argue that each of the more than 4,000 plaintiffs can adequately plead claims for war crimes and crimes against humanity without providing details about the particular victims on whom their claims are based. Pls. Br. 47-49, 51-54. Plaintiffs contend that requiring specific allegations "makes little sense" for crimes against humanity claims because a "widespread attack" is an element of the offense. *Id.* at 50, 53-54. Plaintiffs assert that the district court correctly sustained all of their claims based on general allegations that purportedly apply to all of them.[11]

Neither this argument nor the district court's decision can be squared with this Court's prior decisions. In *Sinaltrainal*, the Court held that, to plead a war crimes claim, a plaintiff must allege that the killing or torture occurred "because of the ongoing civil war." 578 F.3d at 1267. This test necessarily requires a plaintiff-by-plaintiff inquiry. Likewise, in *Mamani*, the Court explained that "isolated events (even if a series of them)" do not constitute crimes against humanity. 654 F.3d at 1156. Instead, a crimes against humanity claim requires a "widespread or systematic attack" that is "carried out in an extensive, organized, and deliberate way." *Id.* A court therefore must examine the individual allegations to distinguish

---

[11] The Wolf plaintiffs make the same argument relying primarily on district court and out-of-circuit decisions. Wolf Br. 34-39. They do not mention *Sinaltrainal* or *Mamani*, much less attempt to distinguish those decisions.

between claims based on isolated events—for example, money or property disputes, as is the case for some plaintiffs (Chiquita Br. 47-48)—and those based on an organized, systematic attack.

Plaintiffs' allegations regarding the purpose behind the killings are indistinguishable from those held insufficient in *Sinaltrainal*.  In *Sinaltrainal*, the Court expressly held that allegations of paramilitary violence committed to "further Defendants' business interests" fail to state a claim.  578 F.3d at 1267. Plaintiffs do not deny that they make the same allegations, but seek to distinguish *Sinaltrainal* by arguing that "Chiquita's business interests converged with the AUC's war strategy."  Pls. Br. 48.  Nothing in *Sinaltrainal* suggests that the defendants' business interests diverged from the AUC's war strategy, much less that the claims failed because of this divergence.

Chiquita does not argue, as plaintiffs contend, that the claims must be dismissed "because there are too many victims."  Pls. Br. 49.  Chiquita argues only that the district court erred by permitting the claims of every plaintiff to proceed based on the same conclusory allegations.  In sustaining plaintiffs' claims, the district court credited plaintiffs' allegations that "[a]ll . . . decedents . . . were victims of the AUC's war strategies and goals," Doc. 412:47, and that the conduct at issue was carried out "as part of a widespread or systematic attack," *id.* at 53. These are precisely the sort of "[f]ormulaic recitations of the elements of a claim"

that are "entitled to no assumption of truth." *Mamani*, 654 F.3d at 1153 (citing

*Iqbal*, 556 U.S. at 681, 129 S. Ct. at 1951).

Plaintiffs further contend that, even if individual allegations are required,

they have satisfied that requirement based on allegations regarding a few plaintiffs.

Pls. Br. 51-53. As Chiquita explained (Chiquita Br. 46-47), the few allegations

that specifically link a particular victim to crimes committed by the AUC do not

allege facts giving rise to a plausible inference that the killings were committed

"because of" the armed conflict or as part of a "widespread or systematic attack."

For example, the factual allegations relating to John Doe 9—that he was a union

leader and a member of a political party that opposed the AUC and was tortured

and killed by paramilitary leaders—are no different from the allegations found

insufficient in *Sinaltrainal*. *Compare* Doc. 285:¶¶ 153-55, *with Sinaltrainal*, 578

F.3d at 1259. In any event, the allegations relating to a few victims cannot justify

the district court's denial of the motion to dismiss for each of more than 4,000

plaintiffs, especially when the majority of these plaintiffs fail to allege *any* detail

with respect to the killing or torture for which they seek relief.[12]

---

[12] The district court's reasoning would allow the *Sinaltrainal* plaintiffs to assert
claims against Chiquita based on allegations deemed insufficient in that case.
Chiquita Br. 45. It matters not that plaintiffs' lawyers have represented that the
*Sinaltrainal* plaintiffs are not plaintiffs in this case. Pls. Br. 50 n.12. When the
*Sinaltrainal* court stated that "vigilant doorkeeping" was necessary to prevent
opening the courthouse doors to every victim of the Colombian conflict, 578 F.3d
(continued…)

Under the district court's ruling, there is no logical limit to who can be joined as plaintiffs in these lawsuits. As some plaintiffs concede, many of plaintiffs' claims are based on "crimes occurring all across Colombia, by units of the AUC not receiving Chiquita's support." Wolf Br. 4. The district court claimed to restrict its ruling to the "banana-growing regions," defined as "primarily in the Urabá and Magdalena areas," Doc. 412:2, but it sustained thousands of claims that do not allege where the incident occurred, or that specifically allege the incidents occurred hundreds of miles outside of Urabá and Magdalena.[13] Similarly, despite acknowledging that those killed for personal reasons have no war crimes claims, the court allowed those claims to proceed. Chiquita Br. 47-48 & nn.7-9.

## 2.    Plaintiffs' FARC Claims Fail For The Same Reasons.

The district court erred in relying on conclusory allegations regarding the right-wing AUC to sustain claims based on violence by the FARC and other left-wing guerilla groups. Chiquita Br. 48-49. The FARC claims should have been dismissed; no allegations link any act of violence to the armed conflict or a widespread or systematic attack by guerilla groups. *Id.* Plaintiffs do not dispute

---

at 1267, it did not suggest that this responsibility could be delegated to plaintiffs' lawyers.

[13] *See, e.g.*, Doc. 394:¶¶ 247-51, 858-62, 910-15, 922-25, 1330, 1332-34, 1336-37; Doc. 449:¶¶ 31-956; *Does 1-976 v. Chiquita Brands Int'l, Inc.*, No. 9:10-cv-80652, Doc. 3:¶¶ 14-989.

these points, asserting instead that Chiquita does not challenge the FARC claims on appeal.  Wolf Br. 49-50; Pls. Br. 54 n.14.  That is plainly incorrect.  The rulings that allowed the FARC claims to proceed were certified for interlocutory appeal, Doc. 522:1-2, and Chiquita's opening brief repeatedly discussed those claims and argued that they should have been dismissed, *see* Chiquita Br. 11, 16-17, 47-55.

IV.  **Plaintiffs Failed To Plead Any Theory Of Secondary Liability By Which Chiquita Could Be Held Liable For Torts Committed By The Colombian Armed Groups.**

   A.  **Plaintiffs Must Allege That Chiquita Acted With The Purpose Of Facilitating The Colombian Groups' Violations Of International Law.**

The district court correctly held that plaintiffs cannot plead conspiracy or aiding and abetting theories unless they allege that Chiquita acted with the "purpose" of facilitating violations of international law.  Doc. 412:67-68, 79. Plaintiffs concede that they must allege "purpose" for their conspiracy claims to survive a motion to dismiss, but they argue that, for aiding and abetting, they need only allege that Chiquita had knowledge that its actions would assist the Colombian groups' international law violations.  Pls. Br. 55, 58-60.  That argument fails.

35

1.    **International Law Dictates The Elements Of Aiding-And-Abetting Liability And Requires Allegations That The Defendant Acted With The Purpose Of Facilitating The International Law Violation.**

As both the Second and Fourth Circuits have held, the elements of aiding and abetting must be derived from international law, not federal common law. *See Aziz v. Alcolac Inc.*, 658 F.3d 388, 398 (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009). "Recognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place." *Talisman*, 582 F.3d at 259. Relying on domestic law would therefore "violate *Sosa*'s command that [the court] limit liability to violations of . . . international law . . . with . . . definite content and acceptance among civilized nations." *Id.* (quotation marks omitted); *see also Sosa*, 542 U.S. at 732 n.20, 124 S. Ct. at 2766 n.20 (courts must determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued").

The Second and Fourth Circuits have also held that a defendant must provide substantial assistance with the *purpose* of advancing the international law violation at issue to be deemed liable for aiding and abetting under the ATS. *See Aziz*, 658 F.3d at 401; *Talisman*, 582 F.3d at 259. Based on an exhaustive analysis of international law sources, including the Rome Statute of the ICC and decisions of international tribunals, these courts concluded that the only standard

36

"sufficiently well-established and universally recognized" under *Sosa* requires an

aider and abettor to act with the purpose of facilitating the commission of the

international law violation.  *See Aziz*, 658 F.3d at 397, 401; *Talisman*, 582 F.3d at

259.[14]

## 2.    Plaintiffs' Arguments For A "Knowledge" Standard Are Unpersuasive.

Relying on several decisions of international tribunals, plaintiffs argue that

knowledge alone should be sufficient to establish aiding-and-abetting liability

under international law.  Pls. Br. 59-60; Wolf Br. 41-48.  But the Second and

Fourth Circuits took into account the decisions of these tribunals, concluding that

their "sporadic forays in the direction of a knowledge standard" were insufficient

to satisfy *Sosa*.  *See Aziz*, 658 F.3d at 401; *Talisman*, 582 F.3d at 259.[15]

---

[14] The Wolf plaintiffs incorrectly claim that there is a "split of authority" among
the courts of appeals on this issue.  Wolf Br. 43-47.  The decisions on which they
rely—*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), and *Doe I v.
Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002)—have been vacated and thus have no
precedential value.  *See Doe v. Exxon Mobil Corp.*, __ F. App'x __, 2013 WL
3970103, at *1 (D.C. Cir. July 26, 2013) (vacating and remanding for
reconsideration in light of both *Kiobel* and *Prosecutor v. Perisic*, Case No. IT-04-
81-T (Feb. 28, 2013)); *Doe I v. Unocal Corp.*, 395 F.3d 978 (9th Cir. 2003)
(vacating panel decision and granting rehearing en banc).

[15] Contrary to plaintiffs' contention (Pls. Br. 58-59), this Court has not held that
the *mens rea* for aiding and abetting is knowledge.  In *Cabello v. Fernández-Larios*,
402 F.3d 1148, 1158-60 (11th Cir. 2005), the trial court gave jury instructions
applying a domestic law standard for accomplice liability; this Court did not decide
whether the instructions were correct because they were not challenged on appeal.
Accordingly, the Court is not bound by *Cabello*'s discussion of the jury
(continued…)

Plaintiffs' reliance on decisions from the ICTY is particularly misplaced given that tribunal's recent decision in *Prosecutor v. Perisic*, Case No. IT-04-81-T Judgment (Feb. 28, 2013), which held that aiding-and-abetting liability requires that the defendant's acts be "specifically directed" to the "specific crime" at issue. *Id.* at ¶¶ 26, 42-43, 73.  Plaintiffs attempt to distinguish *Perisic* on the ground that the tribunal was discussing the *actus reus* for aiding and abetting, not the *mens rea*. Pls. Br. 60 n.15.  But the tribunal's labeling of the elements is not important; what matters is that, under *Perisic*, aiding and abetting cannot be established based on knowledge alone or on the attenuated, general support that Chiquita allegedly provided to the Colombian groups here.  Plaintiffs suggest that *Perisic* may be reversed on further appeal, *id.*, but that suggestion merely confirms that no "consensus exists for imposing liability on individuals who knowingly (but not purposefully) aid and abet a violation of international law," *Talisman*, 582 F.3d at 259.

### B.    No Plaintiff Pleads Facts Sufficient To Link Chiquita To The Tort For Which That Plaintiff Seeks Relief.

Despite adopting the "purpose" standard, the district court did not require any plaintiff to allege facts that, if proved, would establish that Chiquita acted with the purpose of facilitating the specific international law violation for which that

instructions.  *See, e.g.*, *United States v. Seher*, 562 F.3d 1344, 1361 (11th Cir. 2009).

plaintiff sought relief.  Doc. 412:74-76.  Instead, the court held that every plaintiff had stated a claim against Chiquita based solely on allegations that Chiquita generally supported the goals of the right-wing paramilitaries or the left-wing guerillas.  *Id.*  This holding squarely conflicts with *Mamani*, which held that, "to decide whether plaintiffs have stated a claim . . . against *these defendants*, we must look at the facts connecting what *these defendants* personally did to the particular alleged wrongs."  654 F.3d at 1152, 1155 n.8 (emphasis added).

This requirement is not mere dicta, as plaintiffs assert.  Pls. Br. 57.  It was essential to the outcome of *Mamani* because the Court expressly acknowledged that, although the allegations may be sufficient to support an ATS claim against "someone: for example, the shooters," plaintiffs failed to "make out a plausible claim that *these defendants* did things that violated established international law and gave rise to jurisdiction under the ATS."  654 F.3d at 1154, 1155 n.8 (emphasis added).

Plaintiffs are also incorrect in asserting (Pls. Br. 57) that *Mamani* did not address secondary liability: "We do not, in principle, rule out aiding and abetting liability or conspiratorial liability and so on under the ATS, but the pleadings here are too conclusory to make out such a claim against these defendants."  654 F.3d at 1155 n.8.  Even if *Mamani* had not addressed secondary liability, there would be no reason to apply a different rule when secondary liability is at issue.  If anything,

39

there is an even greater need to connect the defendant to the particular alleged wrongs when asserting claims under the attenuated theory of secondary liability at issue here.

Finally, plaintiffs' attempt to distinguish *Mamani* on its facts is unavailing. Plaintiffs note that the claims in *Mamani* failed because, despite the specific allegations that the Bolivian Defense Minister had personally directed a military helicopter where it should fire its weapons, *id.* at 1154, "no plaintiff alleged their decedent was killed from a helicopter," Pls. Br. 58. That is precisely Chiquita's argument here. Plaintiffs have pled some allegations regarding specific incidents involving killings by the AUC, but no plaintiff alleges that his decedent was killed during any of those incidents, much less that Chiquita assisted in the killing.

Chiquita does not argue, as plaintiffs contend (Pls. Br. 56-57), that it could be held liable only if it knew the identities of the victims or the precise injuries they would suffer. Chiquita argues only that, to allege aiding-and-abetting liability, a plaintiff must plead facts to show that Chiquita's actions had a "substantial effect" on the commission of the act of violence on which his claim is based, and that Chiquita acted "with the purpose of facilitating the commission of *that* crime." *Talisman*, 582 F.3d at 259 (emphasis added). There are no such allegations here.

40

### C. Plaintiffs Fail To Plead Any Facts Supporting A Plausible Inference That Chiquita Acted With The Purpose of Supporting These Groups' Violent Acts.

The district court sustained plaintiffs' claims based on only two allegations of specific facts:  (1) Chiquita's payments to the armed groups, and (2) the narcotics and weapons smuggling by third parties through a port operated by Banadex.  Doc. 412: 70-74; 513:6-7.  These allegations are insufficient because they do not support a plausible inference that Chiquita intended to assist in the killing or torture of thousands of Colombians.[16]

Allegations of Chiquita's payments to the AUC are insufficient to show the required purpose because they support the "obvious alternative explanation" that Banadex made the payments to armed groups out of fear for the safety of its own employees.  *See Iqbal*, 556 U.S. at 681-82, 129 S. Ct. at 1951-52.  Plaintiffs' complaints expressly allege that both the AUC and the FARC regularly "engaged in extortion."  Doc. 439:¶ 407; *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 0:07-cv-60821, Doc. 118:¶ 142.  Plaintiffs also incorporated by reference the factual proffer entered as part of Chiquita's plea into some of their complaints and relied

---

[16] The district court also relied on conclusory allegations that Chiquita intended to assist the AUC, Doc. 412:74-80; 513:6-7; 514:5, but these allegations "are entitled to no assumption of truth."  *Mamani*, 654 F.3d at 1153 (citing *Iqbal*, 556 U.S. at 662, 681-82, 129 S. Ct. at 1951-52).

upon it in others.[17]  The proffer explained that the payments to the AUC began

after the AUC's leader "sent an unspoken but clear message that failure to make

the payments could result in physical harm to Banadex personnel and property."

Doc. 449:Ex. 1 ¶ 21.

Plaintiffs ask the Court to treat the portions of the proffer that support their

claims as incorporated into their complaints, but to disregard the portion of the

factual proffer stating that the payments were made to prevent retaliatory violence

against Banadex's employees.  Pls. Br. 64.  This Court does not permit such

selective incorporation.  *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06

(11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not

require us to ignore specific factual details of the pleading in favor of general or

conclusory allegations.  Indeed, when the exhibits contradict the general and

conclusory allegations of the pleading, the exhibits govern.").[18]  In any event, the

---

[17] *See* Doc 284:¶¶ 183-84; 188-90, 215-20; 285:¶¶ 76-77, 81-83, 106-10; 287:¶¶ 468-69, 473-75, 536-38, 540-41; 394:¶¶ 1488-91, 1493-96, 1498, 1501-02; Doc. 439:¶¶ 492, 497, 559-65; 449:Ex. 1; Carrizosa, Doc. 118:¶¶ 40, 44, 98-101; *Does 1-254 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80405, Doc. 3:¶ 291 & p. 70, n.1; *Does 1-677 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80404, Doc. 3:¶¶ 761-62, 766, 768, 794-800; Does 1-976:¶¶ 1050-51, 1055, 1057, 1083-89.

[18] The cases on which plaintiffs rely are inapposite because they hold only that a court need not credit "self-serving statements" in a document authored by a defendant.  Pls. Br. 64 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 675 (2d Cir. 1995)).  Chiquita's factual proffer hardly fits that description.  It (continued…)

Court need not rely on the factual proffer because plaintiffs expressly alleged that the Colombian paramilitary and guerrilla groups "engaged in extortion." *See supra* p. 41.

Plaintiffs also assert that the allegation that "Chiquita initiated the deal to support the AUC" demonstrates the required purpose. Pls. Br. 64. But plaintiffs also allege that the leader of the AUC "asked Chiquita to stop making payments to the leftist guerillas" and "to begin paying the AUC." Doc. 412:72. Plaintiffs' pleadings taken as a whole therefore plainly support the "obvious alternative explanation" that Banadex made payments to protect its employees, not because it wanted thousands of Colombians tortured or murdered.

Nor have plaintiffs alleged any facts to support their assertion that Chiquita purposefully assisted the AUC and the FARC with arms and drug smuggling. Plaintiffs' bare allegations that arms were smuggled through a port operated by Banadex and that drugs were smuggled in Chiquita vessels do not create the reasonable inference that Chiquita purposefully assisted in such smuggling, as

---

was authored by the Department of Justice as much as by Chiquita and had to be accepted by the district court.

opposed to being an unwitting victim of those activities.  *See Mamani*, 654 F.3d at 1155; *Talisman*, 582 F.3d at 262-63.[19]

After multiple opportunities to amend their pleadings, plaintiffs now assert that they can provide "even greater factual detail" about Chiquita's "complicity" in two alleged arms shipments.  Pls. Br. 62 n.16.  But this Court cannot affirm the district court's decision based on allegations that are not in the complaints.  In any event, the allegations that Banadex employees complied with the demand of a group known for its violent acts further supports the obvious alternative explanation that the Banadex employees were themselves victims of the AUC.[20]

Moreover, Chiquita's purpose cannot be inferred from its alleged assistance to the AUC because that assistance is not linked to the victims in either time or

---

[19] Plaintiffs attempt to distinguish *Mamani* and *Talisman* by arguing that Chiquita's alleged assistance involved "inherently criminal acts."  Pls. Br. 66.  But the claims in those cases did not fail because the defendants' actions were lawful; they failed because there were alternative explanations for the defendants' conduct that did not suggest that they intended to facilitate the particular international law violations on which the claims were based.  *Mamani*, 654 F.3d at 1155; *Talisman*, 582 F.3d at 262-63.

[20] Plaintiffs ask the Court to take judicial notice of two Colombian court decisions, but it is unnecessary for the Court to do so in order to decide the issues on appeal. The Court may take judicial notice only "for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the litigation," and not "for the truth of the matters asserted."  *United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994) (quotation marks and citation omitted).  The district court held that the existing complaints sufficiently pled ATS claims.  Plaintiffs cannot defend that decision by ignoring the deficiencies in their existing pleadings and instead pointing to allegations from sources outside of the record.

place.  In fact, Chiquita identified several examples of claims based on killings that

occurred either long before or well after Chiquita's payments to the AUC.

Chiquita Br. 56.  Plaintiffs claim that each of these examples was a mistake.  Pls.

Br. 65 n.19.  But there are many more claims that lack any connection in time to

Chiquita's payments.  Some plaintiffs do not allege a date of injury,[21] others assert

claims for acts committed long before Chiquita's payments to the AUC started,[22]

and many others assert claims for acts committed well after those payments

ceased.[23]  In addition, many claims have no geographic connection to the "banana-

growing regions" where Chiquita supposedly intended for these violent acts to

occur.  Thousands of claims do not allege a region where the incidents of violence

occurred,[24] while others allege places of injury outside of the "banana-growing

---

[21] *See, e.g.*, Doc. 284:¶¶ 276-80, 294-97, 445-52, 476-80, 526-31, 553-57, 628-31, 621-27, 740-44, 745-49, 759-65; Doc. 394:¶ 244.

[22] *See, e.g.*, Doc. 439:¶¶ 40, 41, 79, 108-12, 142, 169, 386 (incidents in 1978-1994); Doc. 449:¶¶ 768, 811-12, 815, 870 (incidents in 1985-1994).

[23] *See, e.g.*, Doc. 449:¶¶ 826, 834, 846, 858, 859, 867, 876, 878, 890, 905, 914, 927, 947 (incidents in 2008-2010).

[24] *See, e.g.*, Doc. 449 ¶¶ 31-956; Does 1-976, Doc. 3: ¶¶ 14-989.  After Chiquita noted that one complaint failed to identify the location of injuries for more than 900 decedents, plaintiffs responded that the information is provided elsewhere in the complaint.  Pls. Br. 65 n.19.  But the complaint does not identify the location of injury; it states only that the plaintiff *or* the decedent was a *resident* in undefined "banana growing regions."  *See* Doc. 449:¶ 10.

regions of Uraba and Magdalena," hundreds of miles away from Banadex's banana farms.  *See supra* p. 34.

Finally, plaintiffs have no response to Chiquita's argument that they failed to plead that Chiquita intended to assist the AUC in torturing and killing *non-combatants*, a requirement for war crimes or crimes against humanity.  Chiquita Br. 57.  The district court held that plaintiffs had satisfied this requirement, but it impermissibly relied only on "statements of legal conclusions rather than true factual allegations."  *Mamani*, 654 F.3d at 1153.  Plaintiffs do not dispute this point.

In short, plaintiffs' theory that Chiquita wanted thousands of people dead in Colombia is not only unsupported by any well-pled factual allegations, but is also contradicted by other allegations in the complaints.  Because plaintiffs have failed to allege facts showing that what Chiquita "did . . . amounts to a violation of already clearly established and specifically defined international law," their ATS claims must be dismissed.  *Id.* at 1152.

## V.    Plaintiffs Concede That Their TVPA Claims Must Be Dismissed.

Plaintiffs concede that *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), requires dismissal of TVPA claims against Chiquita.  Pls. Br. 67.  Plaintiffs assert that TVPA claims against individual defendants are "unaffected," but no such claims are presented in this appeal.

46

## VI.    Plaintiffs' Cross-Appeal Lacks Merit.

Plaintiffs' cross-appeal challenges the district court's ruling on claims that survived Chiquita's motion to dismiss and remain part of the case.  Plaintiffs pled numerous tort claims, including wrongful death, assault and battery, and negligence, under U.S. state or Colombian law.  Doc. 412:86-90.  Although the district court originally dismissed the claims, holding that plaintiffs could not proceed under either state or Colombian law, *id.*, the court later reinstated the claims and allowed them to proceed under Colombian law, Doc. 516:5-6.

The cross-appeal should be dismissed because it does not satisfy the standard for interlocutory appeal under 28 U.S.C. § 1292(b).  In any event, plaintiffs' arguments fail on the merits because the district court correctly determined that the non-federal tort claims could proceed, if at all, only under Colombian law.

### A.    The Cross-Appeal Should Be Dismissed Because It Does Not Satisfy The Standard For Interlocutory Appeal.

This Court decides interlocutory appeals under § 1292(b) only when the appeal presents a "controlling question of law" whose resolution "may materially advance the ultimate termination of the litigation."  *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1253 (11th Cir. 2004).  Plaintiffs' cross-appeal does not satisfy this standard.  Plaintiffs argue that the district court erred in determining that their non-federal tort claims must proceed under Colombian law, but they do

47

not ask this Court to resolve the choice-of-law issue.  Instead, they acknowledge the possibility that the district court correctly determined that their claims are governed by Colombian law, and argue only that the choice-of-law determination should be made later in the case.  Pls. Br. 71-74, 75.

This Court has discretion to vacate an order permitting interlocutory appeal under § 1292(b), and it has repeatedly done so when it determines after full briefing that the requirements for interlocutory appeal are not met.  *Id.* at 1264-65; *see also Rodrigues v. CNP of Sanctuary, LLC.*, __ F. App'x __, 2013 WL 3490393, at *2 (11th Cir. July 12, 2013) (per curiam).  The Court should do so again here.

### B.    Plaintiffs' Non-Federal Tort Claims May Proceed, If At All, Only Under Colombian Law.

If the Court addresses the merits of the cross-appeal, it should affirm the district court's ruling that plaintiffs' non-federal tort claims cannot proceed under state law.

### 1.    None of the Forum States Can Apply Its Laws To Plaintiffs' Claims.

Plaintiffs contend that the district court erred in holding that their claims must proceed under Colombian law because, at this stage in the case, the court must presume that the claims are governed by the law of the forum in which they were brought.  Pls. Br. 71-75.  According to plaintiffs, each of the relevant forum

48

states—Florida, District of Columbia, New Jersey, and New York—applies forum law if no party has alleged a conflict between forum law and another potentially applicable law, and no conflict has been alleged.  *Id.*  This argument fails because both domestic and international law prevent courts in forum states from applying their laws to plaintiffs' claims.[25]

a.  The Due Process Clause forbids a state from applying its law if it "has had no significant contact or significant aggregation of contacts" with "the parties and the occurrence or transaction."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13, 101 S. Ct. 633, 638 (1981) (plurality); *id.* at 332, 650 (Powell, J., dissenting).  This Court has held that a state's attempt to regulate the foreign conduct of companies doing business in the state violated due process.  *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001).  In so holding, the Court rejected the argument that the law satisfied due process because it applied only to insurers doing business in the state.  *Id.*  The Court explained that "[t]he relevant question is whether there exists some minimal

---

[25] Although plaintiffs rely on the Restatement to argue that forum law could apply, Pls. Br. 68, they ignore Section 9, which expressly prohibits a court from applying forum law where the forum lacks significant contacts with the parties and occurrence.  Restatement (Second) Conflict of Laws § 9 (explaining that a court cannot "apply the local law . . . unless such application of this law would be reasonable in the light of the relationship of the state and of other states to the person, thing, or occurrence involved").

49

contact between a State and the regulated *subject*." *Id.* (emphasis in original)
(quotation marks and citation omitted); *see also id.* ("[W]e inquire not only into the
contacts between the regulated party and the state, but also into the contacts
between the regulated *subject matter* and the state." (emphasis in original)
(quotation marks and citation omitted)).

Permitting any of the forum states to apply its law to the conduct at issue
here would similarly violate due process.  Three of the forum states—Florida,
District of Columbia, and New York—have no contacts, much less significant
ones, because none of the parties is a citizen of those states and none of the
conduct at issue is alleged to have occurred there.   New Jersey's sole contact with
the parties—Chiquita is incorporated there—is similarly insufficient.  None of the
relevant conduct is alleged to have occurred in New Jersey, and thus New Jersey
lacks the necessary contact with the regulated subject matter.  *Id.* at 1238; *see also*
*Hague*, 449 U.S. at 311-13, 101 S. Ct. at 639-40 (noting that "nominal residence—
standing alone—[is] inadequate" to satisfy due process).

b.  The forum laws could not apply to the conduct at issue here because they
would impermissibly interfere with the federal government's foreign-affairs power.
The Supreme Court has long recognized that "[o]ur system of government . . .
imperatively requires that federal power in the field affecting foreign relations be
left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63, 61

50

S. Ct. 399, 402 (1941); *see also United States v. Belmont*, 301 U.S. 324, 331, 57 S.

Ct. 758, 761 (1937) ("[C]omplete power over international affairs is in the national

government and is not and cannot be subject to any curtailment or interference on

the part of the several states.").  Because U.S. states play no role in foreign

relations, state laws are preempted pursuant to the Supremacy Clause if their

application would have "a direct impact upon foreign relations and [might]

adversely affect the power of the central government to deal with those problems."

*Zschernig v. Miller*, 389 U.S. 429, 432, 441, 88 S. Ct. 666, 671 (1968); *see also*

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420, 123 S. Ct. 2374, 2389 (2003).

Permitting state tort law to reach the conduct at issue here would plainly

impact U.S. foreign policy.  Plaintiffs' tort claims, like their ATS claims, are based

on alleged torture and killing of Colombians by Colombians in concert with the

Colombian government during an internal armed conflict in Colombia.  Doc.

412:87.  These claims would have considerable foreign policy implications if they

were governed by federal law, *see Sosa*, 542 U.S. at 727-28, 124 S. Ct. at 2763,

and the foreign policy implications would be even greater if they were subject to

the varying tort laws of each of the 50 U.S. states and the District of Columbia, *see*

*Saleh v. Titan Corp.*, 580 F.3d 1, 12-13 (D.C. Cir. 2009) (state-law tort claims

against U.S. defense contractors for involvement in abuse at Abu Ghraib prison in

Iraq were preempted by the federal foreign-affairs power because, among other

reasons, "the interests of any U.S. state (including the District of Columbia) are *de minimis* in this dispute—all alleged abuse occurred in Iraq against Iraqi citizens"). Plaintiffs' claims would therefore be preempted if state law applied.[26]

c.  International law also prohibits the forum states from applying their law extraterritorially.  As the district court explained, the alleged torts are based on "acts by Colombian paramilitaries against Colombian civilians that occurred inside Colombia."  Doc. 412:87.  Although international law permits a forum state to apply its tort law if foreign conduct "has or is intended to have substantial effect within its territory," Restatement (Third) of the Foreign Relations Law § 402(1)(c)), the district court correctly concluded that plaintiffs had not alleged that the conduct at issue had such an effect in the relevant states, Doc. 412:87.

Plaintiffs contend that the Restatement's provisions have no relevance here because they apply only to "public law."  Pls. Br. 68.  In rejecting the same argument, the Third Circuit held that, "in some circumstances, issues of private international law may also . . . *have substantial international significance and*

---

[26] The federal government has also recognized that claims like those at issue here may be preempted on the ground that they interfere with its foreign-affairs powers. *See* Br. for United States as *Amicus Curiae* at 16 n.1, *Exxon Mobil Corp. v. Doe*, No. 07-81 (May 2008) (noting that state-law tort claims regarding acts in a foreign state may be dismissed due to preemption because they present "serious problems of extraterritoriality, disuniformity, and interference with United States foreign policy").

*therefore may be considered foreign relations law*" to which the Restatement would apply—and proceeded to apply Section 402 to a private tort law dispute. *Neely v. Club Med Mgmt. Servs.*, 63 F.3d 166, 183 (3d Cir. 1995) (emphasis in original). This case plainly raises issues with "substantial international significance." *Id.*

Plaintiffs do not deny that their complaints lack any allegations that the conduct at issue had a substantial effect in the forum states. Moreover, their two-sentence response cites no authority: "Chiquita's conduct had substantial effects within the entire United States, and thus within the relevant states. Supporting the AUC was a federal crime precisely because of the harm it inflicted on national security, foreign policy or the economy." Pls. Br. 70. This response is a non-sequitur. Conduct does not have a substantial effect in every U.S. state simply because it is prohibited by federal law. Nor is "[s]upporting the AUC" the relevant conduct. Plaintiffs do not allege that providing such support is a tort recognized by any of the relevant states, but instead assert wrongful death and personal injury torts based on the violence in Colombia.[27]

---

[27] Plaintiffs also suggest that international law permits Ohio and New Jersey to apply their laws because Chiquita is a citizen of both states. Pls. Br. 69. Ohio law is irrelevant because none of the suits were filed in Ohio. Plaintiffs do not argue that a court in any of the forum states would choose to apply Ohio law; they argue that each court must apply its forum law because no conflict is alleged. *Id.* at 74. Plaintiffs cite no authority to support the view that international law would permit (continued…)

In sum, the district court correctly held that plaintiffs' non-federal claims may proceed, if at all, only under Colombian law because both domestic and international law prevent the claims from proceeding under state law.

### 2. The Choice-of-Law Rules On Which Plaintiffs Rely Point To Colombian Law.

Plaintiffs contend that the district court should apply choice-of-law principles, but not until later in the case, to decide whether their non-federal claims are governed by Colombian or U.S. state law. Pls. Br. 75. They argue that a choice-of-law determination is "premature" because "[c]hoice-of-law is typically fact-dependent." *Id.*

But there were no factual issues that prevented the district court from resolving the choice-of-law issue here. The district court simply accepted plaintiffs' allegations as true and concluded that the non-federal tort claims could not proceed under state law. Doc. 412:11-12, 86. That is not an unusual practice. This Court has frequently addressed choice-of-law questions at the motion-to-dismiss stage, including in ATS cases. *See, e.g.*, *Baloco v. Drummond Co.*, 640 F.3d 1338, 1349 & n.12 (11th Cir. 2011); *Membreño v. Costa Crociere S.P.A.*, 425 F.3d 932, 936-37 (11th Cir. 2005).

New Jersey to regulate conduct that occurred entirely outside of the state and had no effect inside it based solely on the fact that a party was a nominal resident of the state. But even if that were permissible under international law, the Due Process and Supremacy Clauses would still prohibit it. *See supra* pp. 49-52.

54

Had the district court analyzed the choice-of-law issue under each forum's rules, it would have reached the same result. In holding that plaintiffs' claims could not proceed under state law, the district court noted that it was "unaware of any of these states' civil tort laws ever being applied to foreign conduct against foreign citizens in the course of a foreign war." Doc. 412:89. Plaintiffs do not cite a single case in which any of the forum states applied its laws to conduct like that at issue here. Instead, they argue only that Colombian law *might* not apply because the place of injury is only one of many factors to be considered under the relevant Restatement provisions, which the forum states have adopted. Pls. Br. 72-73 (discussing Restatement (Second) of Conflict of Laws § 145).

Plaintiffs' argument ignores the importance of the place of injury in tort cases involving personal injuries. In such cases, there is a presumption that the law of the place of injury applies. *See* Restatement (Second) of Conflict of Laws §§ 145-46.[28] That presumption is rebutted only in the "relatively rare situations" in which "the state of injury bears little relation to the occurrence and the parties." *Id.* § 146, cmt. c. Plaintiffs cite no authority suggesting that the presumption is

---

[28] *See, e.g.*, *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008) (discussing the Restatement's "presumption that the local law of the state of the injury will apply" in a personal injury case); *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) ("The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law.").

rebutted here, *i.e.*, that Colombia has "little relation to the occurrence and the parties."  *Id.*  In fact, each of the forum states would apply Colombian law under its choice-of-law rules.[29]

## CONCLUSION

The district court's orders denying in relevant part Chiquita's motions to dismiss should be reversed and the ATS and TVPA claims dismissed.  The cross-appeal challenging the district court's ruling that the common-law claims cannot proceed under state law should be dismissed; in the alternative, the district court's choice-of-law ruling should be affirmed.

---

[29] *See, e.g.*, *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 397 (S.D.N.Y. 2007) (Egyptian law applied to injuries occurring in Egypt where plaintiff was a citizen of Michigan and defendant company was domiciled in New York); *P.V.*, 962 A.2d at 455-56 (Pennsylvania law applied to injuries occurring in Pennsylvania where plaintiffs and defendants were from New Jersey); *Jones v. Clinch*, __ A.3d__, 2013 WL 3940814, at *1-3 (D.C. Aug. 1, 2013) (Maryland law, rather than D.C. law, applied to claim against company incorporated in D.C. where injury occurred in Maryland); *Scotts Co. v. Hacienda Loma Linda*, 2 So. 3d 1013, 1017 (Fla. Dist. Ct. App. 2008) (noting that Panamanian law would apply to injury occurring in Panama where defendant was an Ohio corporation, the product was tested in Florida and South Carolina and assembled in South Carolina, and plaintiff learned of the product in Florida); *Scotts Co. v. Hacienda Loma Linda*, 942 So. 2d 900, 902 (Fla. Dist. Ct. App. 2006).

Respectfully submitted,

_/s/ John E. Hall_____

Jonathan M. Sperling       John E. Hall
COVINGTON & BURLING LLP       James M. Garland
The New York Times Building       Mark W. Mosier
620 Eighth Avenue       COVINGTON & BURLING LLP
New York, NY 10018       1201 Pennsylvania Avenue, N.W.
Telephone: (212) 841-1000       Washington, D.C. 20004
Fax: (212) 841-1010       Telephone: (202) 662-6000
      Fax: (202) 662-6291

September 27, 2013

57

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,576 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4 and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.


/s/ John E. Hall
John E. Hall

## CERTIFICATE OF SERVICE

I, John E. Hall, counsel for appellants and a member of the Bar of this Court, certify that, on September 27, 2013, a copy of this Response and Reply Brief of Appellants Chiquita Brands International, Inc. and Chiquita Fresh North America LLC were electronically filed with the Court using CM / ECF.

I further certify that, on September 27, 2013, copies of this Response and Reply Brief of Appellants Chiquita Brands International, Inc. and Chiquita Fresh North America LLC were sent, by Federal Express for overnight delivery, to the Clerk of the Court and to the following counsel:

Terrence P. Collingsworth
Conrad & Scherer, LLP
1156 15th Street, NW, Suite 502
Washington, DC 20005

William Wichmann
Attorney at Law
888 S.E. 3rd Ave., Suite 400
Fort Lauderdale, FL 33316-1159

Marco Simons
Richard L. Herz
Earthrights International
1612 K Street, NW, Suite 401
Washington, DC 20006

Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY  10118

John Scarola
Searcy Denney Scarola Barnhart & Shipley

2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409

Paul D. Wolf
P.O. Box 46213
Denver, CO 80201

Lee S. Wolosky
Magda Jiménez Train
Boies Schiller & Flexner, LLP
575 Lexington Ave.
New York, NY 10022

I further certify that all parties required to be served have been served.

/s/ John E. Hall
John E. Hall

September 27, 2013